THE STATE, EX REL. VENTRONE ET AL., V. BIRKEL ET AL.

(No. 8433—Decided August 31, 1977.)

*Mr. Anthony Touschner*, for relators.
*Mr. Stephan Gabalac*, prosecuting attorney, and *Ms. Mary Ann Kovach*, for respondents.

BELL, J. Relator Ash is a recipient of this county's General Relief Assistance Program. She and some 1,500 other individuals receive a monthly check not exceeding $44 and are also eligible to receive approximately $50 in federal food stamps. Medical care is available, though limited.

Mrs. Ash occupies a house, the normal monthly rental for which is $140. To date, she has managed to prevent her eviction by paying over her entire relief check each month. The house rent does not include the payment of at least two utilities, electric (the latest bill being $10 and apparently higher than normal) and gas which reached $45 during the winter of 1976. Both utilities are now subject to turn off.

Relator says that since 1968 she has suffered from some form of cancer and as a result, she now suffers a numbness in her hands and arm. This condition makes it necessary to visit a clinic or doctor at least twice each month.

She tells us, in her complaint, that the amount received by her each month is not sufficient to maintain her "health and decency."

The circumstances just related are extracted from relator's deposition, one of the documents introduced into

the record by stipulation of the parties. That record also includes depositions from Mr. Birkel, director of Summit County Welfare and respondent here, Mr. Don Stephens, who (along with his fellow county commissioners) is also a respondent, and others of experience and expertise in the area of county welfare.

Relators bring this original action in mandamus as a class action. They ask that, under Civ. R. 23(C), we certify a class constituted of those presently drawing general relief and those who will do so in the future.

Relators further request such orders as are necessary to oblige respondents to provide relators with such forms of relief as are necessary to maintain each relator's health and decency according to the mandate of state statutes.

## Discussion

The phrase "poor relief," as used to define the public's desire to care for those less fortunate in circumstances than the majority, has its roots in Elizabethan England. Care for the poor has always been a source of anguished concern in our society as our population, particularly our urban population, has expanded and our material costs of existence have risen.

The relief mentioned in the Ohio statute (R. C. Chapter 5113) relates to general or poor relief. *Robinson* v. *Rhodes* (N. D. Ohio), 424 F. Supp. 1183.

Poor relief is defined in R. C. 5113.01 as:

" 'Poor relief' means food, clothing, public or private shelter, the services of a physician or surgeon, dental care, hospitalization, and other commodities and services necessary for the maintenance of health and decency."

The amount of poor relief required to maintain health and decency under this chapter is the central issue of this action.

R. C. 5113.03 states:

"Poor relief shall be given on a budgetary basis and shall be sufficient to maintain health and decency, taking into account the requirements and the income and re-

sources of the recipient. The receipt of other forms of public assistance shall not prevent the receipt of poor relief if additional need exists."

These relators contend that respondents are required to provide poor relief to qualified applicants or recipients residing in this county. They further argue that the amount of such relief must be sufficient to "maintain health and decency."

The threshold question is, do respondents have a clear legal duty to comply with the request of relators? Our review of the statutes applicable here leads us to the opinion that the county commissioners and the director of Summit County Welfare are responsible for the local administration of the general relief program.

The role of respondents, in regard to that area of administration, is defined and structured as follows.

R. C. 329.02 states:

"Under the control and direction of the board of county commissioners, the county director of welfare shall have full charge of the county department of welfare. * * *"

R. C. 5113.02 states:

"In each county the county department of welfare shall exercise the powers and duties assigned to the local relief authority or the local relief director under Chapter 5113. of the Revised Code and shall furnish poor relief to all persons who are eligible for such relief under this chapter. * * *"

In Summit County, poor relief, as we discuss it in regard to the present action, is divided essentially into two classifications, general relief and shelter allowance. The purpose of general relief is to provide food, clothing and personal, as well as incidental needs, to its recipients. The shelter allowance, as the wording implies, is meant to provide housing for all qualifying applicants.

In determining the amount of general relief, respondents appear to have followed Section 413.2 of the Ohio Manual of Public Assistance which provides the following schedule.

| "Number in Relief Group | (1) 100% Standard | (2) Maximum Reimbursable Payment Standards | (3) Minimum Payment Standards | (4) County Payment Standards |
|---|---|---|---|---|
| 1 | $ 63 | $ 43 | $ 28 | $ |
| 2 | 113 | 57 | 34 | |
| 3 | 148 | 74 | 42 | |
| 4 | 196 | 99 | 54 | |
| 5 | 244 | 123 | 66 | |
| 6 | 283 | 143 | 76 | |
| 7 | 329 | 166 | 87 | |
| 8 | 378 | 190 | 98 | |
| .For each additional person above 8, add: | 46 | 23 | 11 | |

."Column number (1) represents the amount determined necessary for the minimum requirement for food, clothing and personal/incidental needs;

."Column number (2) represents the maximum payment standard on which the state will reimburse;

."Column number (3) represents the minimum payment standard which the county may use; and

."Column number (4) is for the county to enter as its payment standard, which must be at least between column numbers (2) and (3). State reimbursement will be limited to county payment standard that falls between amounts shown in columns (2) and (3). If above column (2), maximum reimbursement is based on column (2)."

In an effort to comply with the mandate of R. C. 5113.-03, respondents say they have allocated general relief payments in an amount equivalent to the minimum payment standard as previously set forth.

Regarding the schedule for shelter allowance, the respondents have adopted their own schedule since Section 413.21 of the Ohio Manual of Public Assistance outlines a maximum allowance for shelter and sets forth no minimum standard.

*"County Shelter Allowance for General Relief*

| "Number in Household Group | Number of Rooms | | | | | | |
|---|---|---|---|---|---|---|---|
| | 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 1 | $15 | $16 | | | | | |
| 2 | 20 | 21 | $22 | $23 | | | |
| 3 | 25 | 26 | 27 | 28 | $29 | | |
| 4 | 40 | 41 | 42 | 43 | 44 | $45 | |
| 5 | 50 | 51 | 52 | 53 | 54 | 55 | |
| 6 | 60 | 61 | 62 | 63 | 64 | 65 | |
| 7 | 70 | 71 | 72 | 73 | 74 | 75 | $76 |
| 8 | 80 | 81 | 82 | 83 | 84 | 85 | 86 |
| 9 | 90 | 91 | 92 | 93 | 94 | 95 | 96 |

10 or more add $10 per person to maximum if there are 7 or more rooms."

Essentially, the respondents' position is that, if the county distributes the minimum amounts within the standard set by the director of the State Welfare Department (as required by R. C. 5101.16), then there is complete compliance with R. C. 5113.03. We disagree.

Under R. C. 5113.03, the word "shall" must be read as a mandate to respondents to allocate enough poor relief to qualified applicants to maintain their health and decency.

The precise dollar amount which would satisfy and fulfill this requirement would obviously vary, depending upon the type and resource of the community wherein the applicant lived and the needs of the applicant among other factors. Variant too is the cost of living in the community in question. The welfare relief schedules, quoted above, stand then as guideposts to the county government in indicating appropriate payout schedules, as well as rebates to be made by the state. The minimum payment standard represents the least amount which must be paid by any county. It is the base figure on which all calculations must rest to determine an amount of payment guaranteeing, in the words of the statute, the applicant's "health and decency."

The calculations made to this end must include many

other factors: the cost of food, clothing, personal needs and housing necessary to maintain adequate, even through minimal, health and maintenance. When such standards are established on the basis of such calculations, respondents then must implement and allocate the appropriate funds to comply with the statutory standards as computed above. Simple budgetary allotment of funds without such calculations is not satisfactory.

With these standards in mind, what does the evidence bearing thereon show in the instant case? We consider first the manner in which the amount per person was computed.

From Mr. Birkel we read:

"Q. How are these figures determined, do you know? (speaking of shelter allotments.)

"A. Yes, the total benefits were determined by the amount of money that the Commissioners wished to appropriate to take care of their 25 percent obligation for the year '77. We divided these and came up with a total figure of approximately $44 for an individual and we tried to devise these tables to make sure nobody got less than $44.

"Q. Would it be accurate to say these figures were based on a study of the actual needs of the recipients?

"A. No way.

"Q. They were not?

"A. No."

Again, on the same page:

"Q. In your opinion, do these figures have any relation at all to the actual needs of the recipients?

"A. I think that is self-explanatory. No.

"Q. Do you know of any place in Summit County that an individual could pay all his shelter costs for $15 a month?

"A. County jail. No."

From Commissioner Stephens' deposition:

"Q. Now in your answer to the previous question, you said the first thing that we considered in setting the payment level was the spending level of 1976. Would it be cor-

rect to say that the financial considerations were the *exclusive basis* for determining payment levels? (Emphasis added.)

"A. Yes."

Mr. Stephens then indicated the commissioners' desire (in a county not blessed with sufficient available funds) to stretch each available dollar to meet the various demands of its citizens. He is not sure of any studies made to determine the relationship between funds made available and individual needs. It is all too obvious the commissioners' task was unenviable. Mr. Stephens speaks directly of his feeling that it would be "very difficult" for a person to exist on the present payment amounts. Of a total county budget of some 14 million dollars, the portion designated for general relief approximated $600,000, to cover the needs of approximately 1,500 applicants.

Mrs. Mildred Sexton, supervisor of housing and transportation for the welfare department said:

"Q. And your duties include home finding for general relief recipients?

"A. (Yes) * * * We have no general relief people in requesting housing * * * because we have no place they can afford to pay. So, they're disposing of them in the Service Manager's Unit.

"Q. Now of the hotels, what is the cheapest room that you can rent?

"A. The Empress Hotel, the rent is $57 for a single room or $64 for a single room including a refrigerator."

Compare the above with her other testimony:

"Q. You mentioned $15 or $16 a month. What is this $15 or $16 a month?

"A. It's the amount in their current grant. They get $44.00—a single General Relief client gets $44 a month and according to this State budget, $28 of that is for their standard allowance which would be food, clothing, soaps, any incidentals and the budget says for one room $15; for two rooms $16; * * *.

"Q. In your opinion, are the grants of $44 a month being paid to a single individual in Summit Coun-

ty sufficient to maintain the health and decency of the recipents?

"A. No."

There is no question that the last answer given by Mrs. Sexton is correct. A correct standard for relator Ash and others can be established only by an individual assessment as we have heretofore stated. When the standards previously mentioned are established, respondents thereafter must implement and allocate payments and appropriate monies to comply with those standards. We repeat here the words of the California court in *City and County of San Francisco* v. *Long* (1976), 57 Cal. App. 3d 44, 49:

"In the absence of any standards, we can only conclude that the fixing of a level of aid so far below what is necessary to survive to persons who have no other means by which to live is arbitrary and capricious and not consistent with the objects and purposes of the law relating to public assistance programs * * *."

Nor is it consistent with the ideal of government which places, as does ours, so high a value on the dignity of the individual, no matter his or her station in life.

The present class action is certified under Civ. R. 23 (C). We grant the requested writ and order respondents to comply with the mandates of R. C. 5113.03 in that they determine those amounts necessary to support qualified applicants, present and future, in an amount calculated to maintain the health and decency of that recipient in accordance with this opinion.

*Writ granted.*

Victor and Harvey, JJ., concur.

Harvey, J., retired, of the Court of Common Pleas of Summit County, was assigned to active duty under authority of Section 6(C), Article IV, Constitution.